**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Andrew Hecht and Andrea Hecht, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-05926 |
| v. | ) ) | Hon. Manish S. Shah |
| Cigna Health and Life Insurance Company, | ) ) | |
| Defendant. | ) ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Andrew Hecht and Andrea Hecht ("Andrew" and "Andrea", and together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, and for their complaint against Defendant Cigna Health and Life Insurance Company ("Defendant" or "Cigna"), state as follows:

**NATURE OF THE ACTION**

1.      This is a class action brought by Plaintiffs Andrew Hecht and Andrea Hecht against Defendant Cigna Health and Life Insurance Company on behalf of all current and former participants and beneficiaries of Cigna's employer-sponsored health benefit administration plans, to remedy violations of federal law in connection with Cigna's practices related to its maintenance and communication of in-network provider information.

2.      State and federal laws require health insurance providers to publish and maintain up-to-date provider directories that represent an accurate list of the plan's in-network healthcare

1

professionals, hospitals, and other facilities and providers. This information includes providers' names, locations, specialty types, and whether new patients are accepted.[1]

3. Under Illinois law, "a network plan shall post an electronically up-to-date accurate and complete provider directory for each of its in-network plans . . . The network plan shall update the online provider directory at least monthly . . . The network plan shall update its online provider directory in a matter consistent with the information provided by the provider within 10 business days of being notified of the change by the provider." 215 ILCS 124/25.

4. Under federal law, the "No Suprises Act" requires that all group and individual health plans update their directories of in-network providers and facilities at least every 90 days. Plan administrators must remove unverified providers from their directories within two days of being notified of any changes. Plans are responsible for any out-of-network billing done through providers and facilities listed on the directory as in-network. *See* 26 U.S.C. § 9820.

5. Provider directories are published on insurance providers' websites and are accessible to both beneficiaries and the general public. Given that choosing to see an in-network provider can save beneficiaries hundreds, if not thousands, of dollars, the accuracy of these lists is crucial for beneficiaries, who rely on them to make decisions about which providers they and their families will see for care.

6. Inaccurate directories are known as "ghost networks" or "phantom networks". The inaccuracy of provider directories has become an issue of concern for policyholders,

---

[1] *See* 215 ILCS § 124/1, *et seq.*; 26 U.S.C. § 9820; *see also National Association of Insurance Commissioners (NAIC), Model Laws, Regulations, Guidelines and Other Resources, Health Benefit Plan Network Access and Adequacy Model Act* (Spring 2022); https://content.naic.org/sites/default/files/model-law-state-page-74.pdf (Chart of states that have adopted relevant legislation).

beneficiaries, and legislators alike. The Center for Medicare and Medicaid Services ("CMS") reported that of 15,000 Medicare Advantage ("MA") directories surveyed in a series of three audits conducted from 2016 through 2018, between forty-five and fifty-five percent had errors, some with an error rate as high as ninety-eight percent.[2] The Senate Committee on Finance conducted hearings and produced a report on ghost networks in MA plans in May 2023.[3]

7.       Provider directory inaccuracies are not mere technicalities or inconveniences for plan subscribers. Plan subscribers rely on these directories to make critical choices about access to care. Inaccuracies mean subscribers incur unexpected out-of-network charges, often for thousands of dollars. Subscribers who feel that they cannot rely on their provider directory to ensure they can access affordable in-network providers can suffer detrimental impacts on access to care and long-term health outcomes.

8.       This action does not directly implicate Defendant's failure to maintain an accurate publicly-accessible provider directory. However, the concerns implicated above are squarely presented where, as here, a plan administrator fails to accurately maintain and communicate network provider information, and as a result, plan participants incur unanticipated treatment costs. Where insurer plan administrators maintain inaccurate records of in-network providers

---

[2] *See Online Provider Directory Review Report,* Ctrs. For Medicare and Medicaid Servs., (January 13, 2017) https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/Provider%20Directory%20Review%20Industry%20Report_Final_01-13-17.pdf; *Online Provider Directory Review Report,* Ctrs. For Medicare and Medicaid Servs. (January 19, 2018) https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/Provider_Directory_Review_Industry_Report_Year2_Final_1-19-18.pdf; *Online Provider Directory Review Report,* Ctrs. For Medicare and Medicaid Servs., (November 28, 2018) https://www.cms.gov/medicare/health-plans/managedcaremarketing/downloads/provider_directory_review_industry_report_round_3_11-28-2018.pdf
[3] *See Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Finance Committee (May 3, 2023).

and/or communicate inaccurate information to plan participants about the status of network coverage following a treatment, plan participants suffer immeasurable levels of confusion, as well as financial losses in the form of unexpected health care costs and other financial implications such as a negative impact on their credit ratings.

9.  In the present case, Defendant maintains that the treatment Andrew and his dependent son received was subject to in-network coverage, but the provider disagrees. Defendant has not remedied the discrepancy and, as a result, Plaintiffs have incurred substantial unanticipated costs and suffered a significant decline in their credit scores.  Where there is a discrepancy or dispute between Cigna and a provider over whether a provider is in-network, the cost of resolving that dispute should not be borne by plan participants, but instead by Cigna, which is tasked with maintaining accurate network records and enforcing agreements with in-network providers.  Defendant's actions violate 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), and Plaintiffs bring this action on behalf of all other plan participants and beneficiaries who were similarly aggrieved by Defendant's conduct.

### Parties

10.  Plaintiffs Andrew Hecht and Andrea Hecht are a married couple who reside in DuPage County, Illinois.  Plaintiffs and their minor children have health insurance under a plan sponsored by Andrew's employer and administered by the Defendant, the LocalPlus Medical Benefits Health Savings Account Consumer Driven Plan.

11.  Defendant, Cigna Health and Life Insurance Company, is a Connecticut company with its principal place of business in Bloomfield, Connecticut.  The Defendant and its affiliates administer Cigna Healthcare LocalPlus employer-sponsored plans.

4

**Jurisdiction and Venue**

12.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, specifically 29 U.S.C. § 1132, *et seq*.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132 because, *inter alia*, the Plan is administered in this District, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

**Factual Background**

14.     In the United States, many people rely on health insurance coverage obtained through their employer or through a family member's employer.  Those employers can provide health insurance on either a fully insured or self-insured basis.

15.     When health insurance is offered by an employer on a self-insured basis, the employer assumes the risk of payment of employee medical claims by sponsoring a benefits plan that forms a specific fund for that purpose.  The resulting fund is created by the employer and/or employees who contribute premium payments.  The healthcare claims of the enrolled employees and their dependents are then paid from the fund.

16.     Self-insured health benefit plans are governed and regulated by the Employee Retirement Income Security Act ("ERISA").  An employer who elects to have a self-insured health plan may contract with a third-party commercial insurance company to oversee claims processing and other administrative services related to the plan.  The employer and the third-party commercial insurance company, also known as the Third-Party Administrator ("TPA"), enter into an Administrative Services Only ("ASO") contract.

17.     Cigna Health and Life Insurance Company offers a range of insurance products, including life, disability, health, accident, and Medicare Supplement plans.

18.     Cigna provides claims administration services as a TPA for the employee health benefits plan offered by Andrew's employer, Document Technologies, LLC d/b/a Epiq ("Epiq"). Plaintiffs' plan is known as the LocalPlus Medical Benefits Health Savings Account Consumer Driven Plan (the "Plan").

19.     Andrew began working at Epiq in mid-July 2021.  Before Andrew qualified for benefits with his new employer, the Hecht family bridged the transition from his old plan with health insurance under a Consolidated Omnibus Budget Reconciliation Act ("COBRA") plan.

20.     Approximately two weeks later, at the end of July, Plaintiffs' youngest son ("B.") was diagnosed with leukemia.  Plaintiffs unwillingly had to quickly become experts in navigating the terms of their health insurance policy coverage to manage costs while ensuring their son received the best care possible.

21.     On September 1, 2021, Andrew qualified for Epiq employee benefits, which included the Plan, administered by the Defendant.

22.     On September 6, 2021, Plaintiffs' older son ("R.") began complaining of extreme hip pain.  Andrea took R. to Edward-Elmhurst Hospital ("Edward") in Naperville, Illinois. Andrew remained at home with his younger son, B., who was recovering from a round of chemotherapy.  As the parent accompanying R., Andrea signed all the intake forms related to R.'s admission at Edward.

23.     When emergency room physicians determined that R. would need to be admitted and prepared for transfer to a different hospital for surgery, Andrea called Andrew and asked that he go to Edward to be with R., so she could return home to be with B.

6

24. As it happens, the day before (September 5, 2021), Andrew had twisted his ankle badly. Since he was at the emergency room with R., Andrew asked if a doctor could look at his ankle and order an x-ray if necessary. The x-ray did not show a break, so Andrew returned to R.'s bedside and was given an ace bandage and ice to reduce the swelling in his ankle.

25. According to the booklet available from Cigna's website that describes the benefits available under the Plan, for in-network services the Plan will pay 80% of the cost of services once the plan deductible is met. (*See* Benefit Plan Booklet, attached as Exhibit A.) Under the Plan, the in-network deductible for Plaintiffs' family was $5,500.00. (*See id*.) Due to B.'s treatments for leukemia, Plaintiffs quickly met the in-network deductible for the entire family.

26. As of July 12, 2024, Edward is listed on Defendant's website as an in-network provider for the Plan.[4]

27. On or around October 23, 2021, Plaintiffs received bills from Edward for the services provided to Andrew and R. on September 6th. The statements indicated that Edward was not an in-network provider for the Plan. However, when Plaintiffs checked the Explanation of Benefits ("EOB") documents for the visits on Defendant's website, the EOBs indicated that Edward was an in-network provider and the services for both visits should have been billed as in-network. (*See* EOB for Andrew, attached as Exhibit B; EOB for R., attached as Exhibit C.)

28. The next day, October 24, 2021, Andrew called Defendant's recorded line to get clarification as to why the hospital was billing him as out-of-network, when the EOBs on Defendant's website represented that Edward was in-network.

---

[4] *See* https://hcpdirectory.cigna.com/web/public/consumer/directory/search

29. Defendant's agent reassured Andrew that Edward was in-network, both the EOB statements he had reviewed were correct, and the Hechts only owed the hospital the balances reflected on the EOB statements. Defendant's representative initiated a three-way conference call with a representative from Edward and Andrew. During the conversation, Defendant's representative maintained that Edward was in-network and the out-of-network charges on the billing statements sent by Edward were incorrect.

30. After about three weeks, the status of Plaintiffs' accounts with Edward had not changed. Frustrated, Andrew went to Edward hospital in person on November 19, 2021, to speak with someone in the billing department. Front desk staff told him that there were no personnel on site that handled billing complaints and suggested he try the hospital group's corporate head office. When Andrew arrived at the head office, he was told by security that he could not speak with anyone and was escorted out of the building.

31. Plaintiffs feared that Edward would send the accounts to collections if they refused to make any payments while they waited for the dispute to be resolved. Relying on the representations made by Defendant's customer service representatives, Andrew made payments to Edward for the amounts Plaintiffs would owe if the services were in-network, as reflected in the EOB statements on Defendant's website.

32. To that end, Andrew made a $326.32 payment toward the balance for the services he received, and a $315.37 payment toward the balance for R.'s services. (*See* Payment Record for Andrew, attached as Exhibit D; Payment Record for R., attached as Exhibit E.)

33. The disputed portion of the bills remained unresolved, and Plaintiffs continued to receive bills from Edward for out-of-network charges for both accounts.

8

34.    In or around May 2022, Edward sent Plaintiffs' accounts to a collection agency, RPM Collections.[5]  In September 2022, Andrew called RPM Collections to inform them that the debts they were seeking to collect were invalid.

35.    For months, Andrew made calls to both Edward and Defendant, including several three-way conference calls.  Throughout this timeframe, Defendant's representatives maintained that the services were in-network, while Edward continued to maintain that the services were out-of-network.

36.    On September 9, 2022, Edward told Andrew it had sent the outstanding accounts to its "external claim pricing team".  Plaintiffs had not received any updates from Edward by December 13, 2022, so Andrew called the hospital yet again and was told to call back three weeks later for an update from the external claim pricing team.

37.    In February 2023, RPM Collections closed Plaintiffs' accounts and sent the debts back to Edward.  Edward sent the debts to a new collection agency, and in April 2023, Plaintiffs received debt collection letters from Merchant's Credit Guide Company.  By December 2023, Plaintiffs' credit scores had dropped significantly.

38.    On December 20, 2023, Andrew had yet another three-way conference call with representatives from Edward and Defendant.  He was informed by an agent from Edward that an account review had determined that the services were out-of-network, again.  The Edward agent gave Andrew the name of the Edward billing supervisor, "Julia".

39.    Andrew contacted Julia in December 2023 and January 2024.  During this time, Andrew was told by Defendant's representative that the issue would be escalated to Cigna's

---

[5] The bills for R.'s services were sent to Andrea, while the bills for Andrew's services were sent to Andrew.

9

Provider Support Investigations Unit, and that Defendant would file a complaint with Edward to rectify the incorrect network status and get the accounts out of collections. The agent told Andrew that Edward Hospital was in-network and had been since 2003, and that Cigna would convey all the information needed to demonstrate that the services should have been billed as in-network.

40. Andrew was informed that the investigation would take at least 30 days, plus an additional 15 days to get the accounts out of collections.

41. On January 18, 2024, Andrew received a call from Julia at Edward, who informed him that the services he and R. had received were out-of-network and nothing could be done.

42. Plaintiffs never heard from Defendant again.

43. Throughout their communications regarding the discrepancies, Defendant has consistently represented to Plaintiffs that Edward is in-network, and that the services Andrew and R. received were in-network. The family is already under financial pressure due to medical debts incurred for their son B.'s treatment for leukemia, and in February 2024, Plaintiffs had to take out a Home Equity Line of Credit ("HELOC") loan to manage the medical debts incurred in connection with B's treatment. In reliance on Defendant's consistent confirmation that Edward was in-network and Plaintiffs were only responsible for the in-network balances Plaintiffs already paid to Edward, Plaintiffs have not made any further payments to Edward.

44. The balance that Edward claims Plaintiffs owe remains in dispute.

## Policy Terms

45. The Plan provides, in large part, that, for in-network treatment, the Plan will pay 80% of the provider's charges once the deductible is met, while for out-of-network providers,

10

coverage is 50% after the deductible is met. For in-network services, the Plan deductible is $5,500, while for out-of-network treatment, the deductible is $16,500.

46. The Plan also provides that Defendant is delegated discretionary authority by the Plan to determine Plan eligibility and Plan coverage, and to interpret and apply Plan terms:

Discretionary Authority

The Plan Administrator delegates to Cigna the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to Cigna the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.

(Ex. A, p. 68.)

47. In the present case, Defendant made the determination that the services Andrew and R. received were in-network, and therefore qualified for coverage of 80% of the costs of those services, leaving Plaintiffs responsible for $326.32 and $315.37, respectively.

48. Edward has disputed Cigna's determination that it is in-network under the Plan, and has billed Plaintiffs the balance the services at an out-of-network rate, specifically, $1128.84 for Andrew and $4886.90 for R.

49. As the Plan administrator, Cigna is obligated to ensure that its coverage determinations and computation of benefit payments are accurate. If any discrepancy should arise, it is the responsibility of Cigna, not the Plan beneficiaries, to arbitrate and determine where any errors may have occurred.

50. Defendant has failed to resolve the dispute between Edward and Defendant and has failed to communicate accurate information to Plaintiffs, resulting in damages to Plaintiffs.

11

**Plan Appeals Process**

48.     Plaintiffs' Plan requires that Plan participants follow a prescribed appeal procedure for an adverse benefit determination.

49.     In Plaintiffs' case, however, there has not been an adverse determination by Cigna.  Defendant has not denied coverage, and the EOB statements for the services provided to both Andrew and R. indicated that those services were covered and in-network.  The issue is not that Cigna denied coverage, but that it has repeatedly represented to Plaintiffs that Edward is in-network, while Edward claims that it is not, and in fact has instituted collection procedures against Plaintiffs.

50.     Furthermore, Plaintiffs have had <u>many</u> telephone conversations with Defendant's customer service representatives, and at no point did any one of them suggest that Plaintiffs initiate an appeal.

51.     Under the terms of the Plan, Plaintiffs are entitled to bring a civil action under ERISA section 502(a).

**Class Action Allegations**

52.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of a class defined as follows:

> All persons covered by health insurance obtained through their employer or through a family member's employer, pursuant to a plan administered by Defendant, who underwent treatment and received an Explanation of Benefits from Defendant indicating that the treatment provider was in-network, and the provider requested payment inconsistent with Defendant's representation that the provider was in-network (the "Class").

53.     Excluded from the Class are: (i) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and

12

successors; (ii) all Class Members that timely and validly request exclusion from the Class; (iii) the Judge presiding over this action; and (iv) Class counsel.

54.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

55.     The members of the Class are so numerous that joinder of the Class members would be impracticable.  On information and belief, Class members number in the hundreds, if not thousands.  The precise number of Class members and their addresses are presently unknown to Plaintiffs but may be ascertained from Defendant's records.

56.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Such common questions of law or fact include, *inter alia*:

   a.     Whether Defendant violated ERISA by representing to insureds that providers were in-network, when the providers asserted they were out-of-network and billed Plaintiffs and Class members at the out-of-network level;

   b.     Whether Plaintiffs and the other Class members have been damaged and, if so, the extent of such damages; and

   c.     whether Plaintiffs and the other Class members are entitled to declaratory and injunctive relief.

57.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class members. Similar or identical statutory violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

58.     Plaintiffs' claims are typical of the claims of the other Class members because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct described above.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and no defense is available to Defendant that is unique to Plaintiffs.

59.      Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class they represent and have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse or antagonistic to those of the Class.

60.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other detriment suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

14

61.     Furthermore, a class action is an appropriate method for the fair and efficient adjudication of this controversy, because prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. Moreover, Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

### COUNT I [6]
### (Violations of ERISA § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b))

62.     Plaintiffs reassert and re-allege paragraphs 1-61 as though fully set forth herein.

63.     Under §502(a) of ERISA, Plaintiffs and Class members are entitled to recover benefits due under the terms and conditions of their plans.

64.     Under §502(a) of ERISA, Plaintiffs and Class members are further entitled to enforce their rights under the terms and conditions of their plans.

65.     In violation of ERISA, Defendant has:

   a.     Failed to make payments of benefits on behalf of Plaintiffs and Class members, as required under the terms and conditions of the plans;

   b.     Made claims determinations without valid data or in an arbitrary fashion;

   c.     Failed to provide a "full and fair review" to Plaintiffs and Class members in order to resolve the discrepancies between Defendant's determinations and the providers' determinations; and

   d.     Failed to provide Plaintiffs and Class members with all rights under the terms and conditions of their plans, as required by ERISA.

66.     Defendant has breached the terms and conditions of the plans by failing to accurately communicate the network status of providers, by failing to resolve provider disputes,

---

[6] By way of the Order issued on February 27, 2025 (Dkt. 36), the Court dismissed this claim. Plaintiff restates the claim here, and pleads it in the alternative, to preserve it for appeal.

and by failing to cover the cost of services received from a provider represented as in-network that disputed its network status.

67. Plaintiffs seek to recover the benefits due to them and Class members under their plans, to enforce rights under the plans, and to clarify future rights under the plans.

68. As a direct result of the conduct of the Defendant, Plaintiffs and Class members have been forced to retain legal counsel and have incurred costs and attorneys' fees in pursuing this action. Therefore, Plaintiffs and Class members are entitled to an award of reasonable attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

## COUNT II
**(Alternative Claim for Breach of Fiduciary Duties under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

69. Plaintiffs reassert and re-allege paragraphs 1 – 61 as though fully set forth herein.

70. This claim for relief is pled in the alternative to Plaintiffs' claim for relief under Count I.

71. Defendant owes plan beneficiaries statutory fiduciary duties of loyalty and care under 29 U.S.C. §1104, which require Defendant to discharge its duties in the best interests of all plan beneficiaries in its capacity as the TPA, insurer, plan administrator, claims administrator, plan, and/or plan sponsor.

72. Plaintiffs and Class members are entitled to assert claims for appropriate equitable relief for Defendant's breaches of fiduciary duties of loyalty and care under 29 U.S.C. § 1132(a)(3).

73. Defendant has violated its fiduciary duties of care and loyalty by, among other things, failing to resolve network disputes between Defendant and providers, shifting the costs of

16

services to plan participants in favor of Defendant's own interests rather than the interests of the plan beneficiaries.

74.     By engaging in the conduct described above, Defendant has acted in an arbitrary and capricious manner and has failed to act with the care, skill, prudence, and diligence that a prudent fiduciary would use, or to act in accordance with the terms and conditions of the plans, as required by ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

75.     As a proximate result of Defendant's breaches, Plaintiffs and Class members have been damaged and will continue to suffer such damages in the future unless Defendant is required to (1) reprocess the claims of Plaintiffs and Class members; (2) properly investigate and resolve provider disputes relative to those claims; (3) provide restitution, surcharge, or other equitable relief to Plaintiffs and Class members in connection with those claims; and (4) going forward, communicate accurate network provider information to Plaintiff and Class members, process Plaintiffs' and Class members' claims in accordance with accurate network information and investigate and resolve provider disputes related to Plaintiffs' and Class members' claims.

76.     As a direct result of the conduct of the Defendant, Plaintiffs and Class members have been forced to retain legal counsel and incur costs and attorneys' fees in pursuing this action.  Therefore, Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment in their favor and against Defendant and for the following relief:

a.     Certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

b.     Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

17

c.      Awarding Plaintiffs and the other Class members monetary damages;

d.      Awarding Plaintiffs and the other Class members declaratory, injunctive, and other equitable relief;

e.      Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

f.      Awarding Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses; and

g.      Granting such other relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial on all claims so triable.

Dated: March 6, 2025                          Respectfully Submitted,


By:     */s/ Martin W. Jaszczuk*

Matthew T. Peterson
**CONSUMER LAW ADVOCATE, PLLC**
230 E. Ohio St., Suite 410
Chicago, IL 60611
Telephone: (815) 999-9130
mtp@lawsforconsumers.com
ARDC# 6321290

Martin W. Jaszczuk
Margaret M. Schuchardt
**JASZCZUK P.C.**
311 South Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: (312) 442-0509
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com

***Attorneys for Plaintiffs***

19

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing

PLAINTIFFS' FIRST AMENDED COMPLAINT was served this 6th day of March via the

court's ECF system on all parties of record.

*s/ Margaret M. Schuchardt*